## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIRST STATE INS. CO., NEW ENGLAND REINSURANCE CORP., <br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN HOME ASSURANCE CO., *et al.*, <br> *Defendants*. | No. 3:16-cv-1822 (VAB) |

## RULING AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Defendants Century Indemnity Co. ("Century Indemnity"), Federal Insurance Company ("Federal"), Fireman's Fund Insurance Company ("Fireman"), Columbia Casualty Company ("Columbia Casualty"), and Central National Insurance Company ("Central" or "Central National") have all moved for summary judgment. *See* Partial Mot. for Summ. J. on Duty to Defend and Reimburse Defense Costs by Century Indemnity and Federal, ECF No. 299 (Sept. 6, 2019) ("Century Indemnity and Federal Mot."); Partial Mot. for Summ. J. by Fireman, ECF No. 306 (Sept. 6, 2019) ("Fireman Mot."); Partial Mot. for Summ. J. on Aggregate Limits by Central National, ECF No. 312 (Sept. 6, 2019) ("Central Mot. Aggregate Limits"); Partial Mot. for Summ. J. on Prior Insurance and Non-Cumulation of Liability Provisions by Central National, ECF No. 317 (Sept. 6, 2019) ("Central Mot. Liability").

For the following reasons, the motions for summary judgment are **GRANTED**.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the sale of products allegedly containing asbestos. SMF, ECF No. 307-2 ¶ 1 (Sept. 6, 2019) ("CNA SMF"); First State Statement of Facts in Opp'n, ECF No. 334-1 ¶ 1 (Oct. 18, 2019) ("Opp'n CNA SMF"). Ferguson Enterprises, Inc. ("Ferguson") "is the

alleged corporate successor to Familian[,]" the distributor of the supplier of the allegedly asbestos tainted products, *id.* ¶¶ 1–2, "including industrial pipe, valves and fittings, heating and cooling equipment, waterworks products, and gaskets." Mem. in Supp. of Summ. J., ECF No. 306-3 (Sept. 6, 2019) ("Fireman Mem.").

Underlying lawsuits for related claims began in 1997 and exhausted Familian's primary policies in approximately 2002. CNA SMF ¶¶ 3–4. The underlying lawsuits pertain to bodily injuries allegedly caused by the products containing asbestos sold by Familian. Fireman SMF, ECF No. 306-2 ¶ 4 (Sept. 6, 2019) ("Fireman SMF") (citing Am. Compl. ¶ 43). In this case, "First state seeks declarations regarding the insurers' respective obligations with respect to the Underlying Lawsuits." CNA SMF ¶ 6; Opp'n CNA SMF ¶ 6. "Ferguson has asserted cross-claims against the excess insurers that also seek declarations regarding the insureds' respective obligations with respect to the [u]nderlying [l]awsuits." Fireman SMF ¶ 7.

### A. Factual Background[1]

#### 1. Century/Federal

"Federal Insurance Company issued an excess liability policy to Familian Corporation for the period from April 1, 1981 to April 1, 1982." Century/Fed. SMF, ECF No. 300 ¶ 1(Sept. 6, 2019) ("Century/Fed. SMF"); First State Statement of Material Facts in Opp'n and Additional Material Facts, ECF No. 332-1 ¶ 1 (Oct. 18, 2019) ("Opp'n Century/Fed. SMF"); Ferguson Statement of Material Facts in Opp'n and Additional Material Facts, ECF No. 327-1 ¶ 1 (Oct. 18, 2019) ("Ferguson Opp'n Century/Fed. SMF"). The policy establishes a limit of "$10 million per occurrence or annual aggregate excess of $10 million each occurrence and annual aggregate excess of primary." *Id.* The policy language, defining loss and underlying insurance, determines

---

[1] All statements of fact are admitted unless otherwise noted by the Court.

Federal's obligations depending on "the facts and circumstances of each claim." *Id.* ¶¶ 2–3;

Opp'n Century/Fed. SMF. ¶¶ 2–3; Ferguson Opp'n Century/Fed. SMF ¶¶ 2–3. Paragraph 7

delineates "Federal's obligations with respect to the defense of underlying claims . . . ." *Id.* ¶ 4.

Parties dispute whether "Federal's obligation to reimburse costs and interest cannot be

determined until Ferguson asks for Federal's consent to incur those costs." Ferguson Opp'n

Century/Fed. SMF at 4 ¶ 2; Century and Federal's Opp'n to Ferguson's Additional Material

Facts, ECF No. 354 ¶ 2 (Dec. 17, 2019) ("Century/Fed. Opp'n").

     "Century Indemnity Company is a successor-in-interest to CCI Insurance Company,

which is a successor-in-interest to Insurance Company of North America ("Century")." *Id.* ¶ 5.

"Century issued an excess liability policy to Familian Corporation for the period from December

18, 1984 to April 1, 1985." *Id.* ¶ 6. The policy has a "$20 million combined single limit each

occurrence and in the aggregate of primary insurance." *Id.* Paragraph C delineates "Century's

obligations with respect to the defense of underlying claims . . . ." *Id.* ¶ 7; Opp'n to Century/Fed.

SMF ¶ 7 (admitting that Century accurately quotes the policy language); Ferguson Opp'n to

Century/Fed. SMF ¶ 7 (admitting the policy contains the quoted language). Parties dispute

whether "Century's obligation to reimburse court costs [can] be determined until Ferguson asks

for Century's consent to incur those costs." Ferguson Opp'n to Century/Fed. SMF at 4 ¶ 4;

Century/Fed. Opp'n ¶ 4.

### 2.  Fireman

     Fireman "issued a third-layer excess policy to Familian . . . with $10 million in limits

effective 4/1/82-4/1/82 . . . ." Fireman SMF ¶ 8; Ferguson SMF and Additional Material Facts in

Opp'n to Fireman, ECF No. 327-1 (Oct. 18, 2019) ¶ 8 (admitting that Fireman "sold Familian an

excess liability policy with a policy period of September 16, 1982, to March 1, 1983"). The

Fireman Policy "is excess over $20.6 million in underlying insurance, which is comprised of an exhausted primary policy issued by Royal Globe Insurance Company, a first layer excess umbrella policy issued by First State with limits of $10 million (the "First State Policy") . . ., and a second-excess layer policy issued by Comstock with limits of $10 million." *Id.* ¶ 9. Parties agree on the relevant policy language in both the First State Policy and the Fireman Policy. *Id.* ¶¶ 10–14; Ferguson SMF in Opp'n to Fireman ¶¶ 10–14; First State SMF in Opp'n to Fireman, ECF No. 335-1 ¶¶ 10–14 (Oct. 18, 2019) ("Opp'n to Fireman SMF"); *see also* Ferguson Opp'n to Fireman at 7–9, ¶¶ 1–5; Fireman's Response to Ferguson's Additional Material Facts, ECF No. 346 ¶¶ 1–5 (Dec. 17, 2019).

The Fireman, Comstock, and First State Policies were issued to Familian in California. Ferguson SMF in Opp'n ¶ 15 (disputing that "all other policies in this action were issued to Familian in California" as lacking support). Comstock and its parent company became insolvent in June 2003. Fireman SMF ¶¶ 16–17. "[T]he California Insurance Commissioner obtained the Conservation Order over Freemont and Comstock." *Id.* ¶ 17. The Conservation Order, in relevant part, enjoins prosecuting any lawsuit against Comstock. *Id.* ¶ 18. "Comstock is not a party to this action." *Id.* ¶ 19.

Fireman "requested that plaintiffs and Ferguson stipulate 'that the 82-83 [FFIC] excess policy does not drop down to provide coverage in place of the Comstock policy and that Ferguson bears the risk and responsibility for all sums and costs otherwise payable under the Comstock policy up to its limits." *Id.* ¶ 20 (alteration in the original) (citation omitted); Opp'n to Fireman SMF ¶ 20 (admitting the fact); Ferguson Opp'n to Fireman SMF ¶ 20 (denying the statement is material to the decision of the motion). Plaintiffs did not respond and Ferguson "declined to enter into the proposed Stipulation." *Id.* ¶ 21; Opp'n to Fireman SMF ¶ 21

(admitting); Ferguson Opp'n to Fireman SMF ¶ 20 (denying the statement is material to the decision of the motion).

### 3. Central National

Central National issued an umbrella liability policy to Familian "for a one-year period from March 5, 1979 to March 5, 1980" (the "Umbrella Policy"). SMF, ECF No. 312-1 ¶ 1 (Sept. 6, 2019) ("Central Aggregate SMF"). The Umbrella Policy's aggregate limit "is $5 million excess $500,000 combined single limit each annual aggregate period of insurance." *Id.* ¶ 2. Parties agree on the relevant Umbrella Policy language. *Id.* ¶ 3; First State SMF in Opp'n to Central. Mot. Aggregate Limits, ECF No. 330-1 ¶ 3 (Oct. 18, 2019) ("Opp'n SMF to Central Aggregate"); Ferguson SMF in Opp'n to Central Mot. Aggregate Limits, ECF No. 323-1 ¶ 3 (Oct. 18, 2019) ("Ferguson Opp'n SMF to Central Aggregate"). In the Umbrella Policy, "annual Period" is defined as "each consecutive period of one year commencing from the effective date of this policy." *Id.* ¶ 4; Ferguson Opp'n SMF to Central Aggregate ¶ 4 (admitting the American Home Assurance Company Policy contains this language).

Central National also issued an excess umbrella liability policy for the same one-year period. *Id.* ¶ 5. Under the terms of this policy, the "aggregate limit . . . is $5 million excess $5 million excess primary." *Id.* ¶ 6; Ferguson Opp'n SMF to Central Aggregate ¶ 6 (admitting "that Endorsement 2 of the policy references 'underlying limits' of $5,000,000 after which this policy provides $5,000,000 'in the aggregate for each annual period during the currency of this policy[.]'" (alteration in the original)). The excess policy "is subject to an aggregate limit 'for each annual period during the currency of this policy . . . .'" *Id.* ¶ 7 (emphasis omitted); Opp'n SMF to Central Aggregate ¶ 7 (admitting the quoted language); Ferguson Opp'n SMF to Central

Aggregate ¶ 7 (admitting the excess policy includes the quoted language, but denying the Umbrella Policy includes the quoted language).

On February 28, 1980, "Familian's broker requested that the expiration dates be amended to April 1, 1980" and requested "that additional premium endorsements be issued as soon as possible." *Id.* ¶ 8; Ferguson Opp'n SMF to Central Aggregate ¶ 8 (admitting Central National's motion include "a transmittal dated February 28, 1980").

On March 6, 1980, Central National "issued an endorsement extending the expiration date of the Umbrella Policy from March 5, 1980 to April 1, 2980." *Id.* ¶ 9. The endorsement's effective date was March 1, 1980 and the "additional premium for the extension of the Umbrella Policy was $4,958." *Id.*; Ferguson Opp'n SMF to Central Aggregate ¶ 9 (admits "that Endorsement No. 10 provides that 'in consideration of additional premium, it hereby agreed [sic] that is amended to read as follows: Expiration – April 1, 1980").

On March 8, 1980, Central National issued another endorsement "extending the expiration of the Excess Policy from March 5, 1980 to April 1, 1980, effective March 5, 1980." *Id.* ¶ 10; Ferguson Opp'n SMF to Central Aggregate ¶ 10 (admitting "that Endorsement No. 5 provides that 'in consideration of additional premium, it hereby agreed [sic] that is amended to read as follows: Expiration – April 1, 1980"). "The additional premium for the extension of the Excess Policy was $740." *Id.* The same day, Familian confirmed "the extensions at the same terms, conditions and premium base." *Id.* ¶ 11; Opp'n SMF to Central Aggregate ¶ 11 (admitting Familian's broker sent a letter "confirming the extensions at the same terms, conditions and

6

premium base"); Ferguson Opp'n SMF to Central Aggregate ¶ 11 (admitting the letter sent from Familian to Central contains the quoted language).

"The Umbrella Policy obligates Central National 'to indemnify the insured for all sums which the insured shall be obligated to pay . . . for damages, direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss' on account of: (1) personal injury . . . caused by or arising out of an occurrence[.]" Ferguson Opp'n SMF to Central Aggregate at 4–5, ¶ 1 (alterations in the original); Central National's Response to Ferguson's Additional Material Facts, ECF No. 360 ¶ 1 (Dec. 17, 2019) ("Central Opp'n SMF") (denying as the obligations "are subject to all terms and conditions of that policy, which speak for themselves"). Item 6 of the Declarations states the limits in aggregate for each annual period. *Id.* ¶ 2; Central Opp'n SMF ¶ 2 (denying for the same reasons). Each annual period in the Umbrella Policy "commenc[es] from the effective date this policy [sic][,]" the effective policy date is March 5, 1980, and the first anniversary is March 5 or 6, 1980. *Id.* ¶¶ 3–5; Central Opp'n SMF ¶ 3–5 (denying for the same reasons).

The Excess Policy states "that Central National's obligations are $5,000,000 in the aggregate for each annual period during the currency of this policy[.]" *Id.* ¶ 7 (alteration in the original); Central Opp'n SMF ¶ 7 (denying for the same reasons). The excess policy annual period began March 5, 1979 and ended March 5, 1980, meaning the second annual period started on March 6, 1980." *Id.* ¶¶ 8–10; Central Opp'n SMF ¶¶ 8–10 (denying stating the policy term was extended to April 1, 1980 and that, by endorsement, the policy term was extended to April 1, 1980).

Central National issued two more policies: another Umbrella Policy effective from April 1, 1980 to April 1, 1981 and another excess policy effective from April 1, 1980 to April 1, 1981.

Central National SMF Liability, ECF No. 315 ¶¶ 5, 7 (September 6, 2019) ("Central SMF Liability"); Ferguson Opp'n SMF to Central National Liability, ECF No. 329-1 ¶ 8 (Oct. 18, 2019) (denying on grounds that the excess liability policy period ran from April 29, 1980 to April 1, 1981). The Umbrella Policy had an aggregate limit of "$10 million per occurrence and aggregate, excess of primary coverage of $500,000 combined single limit each aggregate period of insurance" and the excess policy had an aggregate limit of "$10 million per occurrence and aggregate, excess of $10 million per occurrence and aggregate . . . excess of primary." *Id.* ¶¶ 6, 8; Ferguson Opp'n SMF to Central Liability ¶¶ 6, 8. Both of the umbrella policies and excess policies contain a condition entitled "PRIOR EXCESS INSURANCE AND NON-CUMULATION OF LIABILITY," the terms of which are uncontested. *Id.* ¶¶ 9, 11. The clause in the Umbrella Policy "refers to the aggregate limits of each of the two" umbrella policies, *id.* ¶ 10, and in the excess policy, the clause refers "to the per occurrence and aggregate limits of each of the two" excess policies, *id.* ¶ 12.

### B. Procedural History

On November 4, 2016, First State filed a Complaint. Compl., ECF No. 1 (Nov. 4, 2061).

On January 11, 2017, First State filed an Amended Complaint. Am. Compl., ECF No. 55 (Jan. 11, 2017).

On July 24, 2017, First State and New England Reinsurance Corporation (together, "First State") filed a Second Amended Complaint against American Home Assurance Company ("American Home") and Central National, but only as to policies issued by Cravens, Dargan & Company, Pacific Coast and its subsidiaries, Century Indemnity, Columbia Casualty, Continental Insurance, Federal, Fireman, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Swiss Reinsurance American Company (successor-in-interest to Forum

Insurance Company) (together, "Defendant Insurers"), and Ferguson Enterprises, Inc. Second Am. Compl., ECF No. 147 (July 24, 2017).

The Second Amended Complaint asserts six claims for relief: (1) declaration of coverage of whether and to what extent the Defendant Insurers "are obligated under their respective policies to defend Ferguson or to reimburse it for defense costs incurred in connection with the Underlying Lawsuits"; (2) declaration of coverage of whether and to what extent the Defendant Insurers are obligated to indemnify Ferguson or reimburse it for indemnity costs incurred in connection with the Underlying Lawsuits; (3) declaration of the Defendant Insurers' "respective allocable shares, if any, of the past and/or future defense costs incurred in the Underlying Lawsuits"; (4) declaration of the Defendant Insurers' "respective allocable shares, if any, of the past and/or future indemnity costs incurred in the Underlying Lawsuits"; (5) if First State is found to have paid more than its share of the defense or indemnity costs, declaration that First State is entitled to reimbursement for the appropriate share of their defense and indemnity payments; and (6) declaration that First State is "equitably subrogated to Ferguson's rights against certain of the defendant insurers and/or the Doe Insurers to recover the above-described defense and indemnity amounts owed by Certain Defendant Insurers and/or Doe Insurers." Second Am. Compl. ¶¶ 52–71.

On September 28, 2018, following extensive motions practice, the Court granted partial summary judgment on the issues of policy aggregate limits to Swiss Reinsurance American Company ("Swiss Re"), statute of limitations to American Home, and statute of limitations and

partial joinder to Columbia Casualty Company and Continental Insurance Company. Order, ECF No. 262 (Sept. 28, 2018) ("Order").

On September 6, 2019, several Defendants moved for partial summary judgment.

Century Indemnity and Federal moved for partial summary judgment and sought a declaration "that Federal and Century [Indemnity] have no duty to defend or duty to reimburse defense costs." Century Indemnity and Federal Mot. at 1; *see also* Century/Fed. SMF; Mem. in Supp., ECF No. 296 (Sept. 6, 2019) ("Century/Fed. Mem.").

Fireman moved for partial summary judgment that its "Policy No. XLX 148 10 96 does not 'drop down' in place of coverage issued by Comstock, an insolvent insurance company[.]" Fireman Mot. at 1; Fireman SMF; Fireman Mem.

Central National also moved for summary judgment that "the aggregate limit under the Central National Umbrella Policy is $5 million and the aggregate limit under the Central National Excess Policy is $5 million." Central Mot. Aggregate Limits. at 1; Central Aggregate SMF; Mem. in Supp., ECF No. 312-7 (Sept. 6, 2019) ("Central Mem. Aggregate Limits").

Lastly, Central National moved for summary judgment "that amounts paid under Central National Umbrella Policy no. CNU 03-34-16 and Central National Excess Policy no. CNZ 14-08-39 for the underlying asbestos-related claims at issue reduce the aggregate limits of Central National Umbrella Policy no. CNU 03-62-92 and Central National Excess Policy no. CNZ 14-20-43." Central Mot. Liability at 1; SMF, ECF No. 317-1 (Sept. 6, 2019) ("Central Liability SMF"); Mem. in Supp., ECF No. 317-7 (Sept. 6, 2019) ("Central Mem. Liability").

On October 18, 2019, Plaintiffs filed responses. Opp'n to Central, ECF No. 323 (Oct. 18, 2019); Ferguson Opp'n to Fireman, ECF No. 325 (Oct. 18, 2019); First State Opp'n to Fireman, ECF No. 335 (Oct. 18, 2019) ("Opp'n to Fireman"); Opp'n to Century/Fed., ECF No. 370 (May

11, 2020); Fergson Opp'n to Century/Fed., ECF No. 327 (Oct. 18, 2019); Opp'n to Central

Liability, ECF No. 329 (Oct. 18, 2019); Opp'n to Central Aggregate Mot., ECF No. 330 (Oct.

18, 2019).

On the same day, Ferguson also filed opposition memoranda. Ferguson Opp'n to Central

National Aggregate Mot., ECF No. 323 (Oct. 18, 2019); Ferguson Opp'n to Fireman, ECF No.

325 (Oct. 18, 2019); Ferguson Opp'n to Century/Fed, ECF No. 327 (Oct. 18, 2019); Ferguson

Opp'n to Central National Liability, ECF No. 329 (Oct. 18, 2019);

On December 17, 2019, Defendants filed replies. Fireman Reply, ECF No. 345 (Dec. 17,

2019); Century/Fed. Reply, ECF No. 351 (Dec. 17, 2019); Central Reply Aggregate, ECF No.

358 (Dec. 17, 2019).

On May 21, 2020, the Court held a motion hearing by videoconference. Minute Entry,

ECF No. 372 (May 21, 2020).

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue

as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient evidence to establish that there is a genuine issue of

material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

The Declaratory Judgment Act, 28 U.S.C. § 2201, empowers courts to render declaratory judgments on cases that are "sufficiently real and immediate, allowing specific and conclusive relief . . . and [] ripe for adjudication." *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 244 (1952); *see also Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 348, 444 (D. Conn. 2010) ("Declaratory judgment would thus provide the parties with specific, conclusive relief in resolving whether Middlesex has a duty to defend."). Such relief, where appropriate, can be provided at the summary judgment stage. *Id.* (citing *Cmty. Action for Greater Middlesex Cty., Inc. v. Am. All. Ins. Co.*, 254 Conn. 387, 397–98 (2000)).

## III.   DISCUSSION

There are five pending motions for summary judgment relating to the interpretation of provisions and clauses specific to each policy and concerning the scope of liability of each insurer to pay or defend associated costs.

### A.   Preliminary Legal Issues

Before addressing the various claims of the parties, three legal issues require resolution: (1) the propriety of addressing these issues by way of summary judgment; (2) the choice of law; and (3) the applicable principles of law, having decided which forum's law governs.

First, summary judgment is appropriate on these motions because all parties agree that there is no genuine dispute of material fact. First State, Ferguson, Century/Federal, Fireman,  and Central National—the movants here—all agree that the policies at issue were issued by

Century/Federal, Fireman, and Central National to Familian, and there is no dispute as to the literal text of those policies. *See* D. Conn. L. Civ. R. 56(a)1 Statements, ECF Nos. 297, 306-2, 307-2 310, and 315.  All movants who agree that determining the monetary levels of coverage in these policies, extent of contractual obligations, and period of liability solely involve questions of law—namely, the application of principles of contract interpretation.

Accordingly, summary judgment on these motions is appropriate.[2]

Second, in a diversity case, the Court applies the choice-of-law rules of the forum state, which here is Connecticut. *See Bigio v. Coca-Cola Co.*, 675 F.3d 164,169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state."). Connecticut's choice of law approach for contracts is the most significant relationship test under the Second Restatement of Conflict of Laws. *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 781 (2000); *see also Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007) (noting that in *Reichhold*, the Connecticut Supreme Court "adopted the 'most significant relationship' approach of the Restatement (Second) of Conflict of Laws, for analyzing choice of law issues involving contracts"). "With respect to liability insurance contracts, the starting point is § 193 of the Restatement (Second), which creates a rebuttable presumption in favor of the state where the insured risk is located. In order to overcome the presumption, another state's interest must

---

[2] The claims here are often referred to as "long-tail" injuries and are "characterized as a series of indivisible injuries attributable to continuing events without a single unambiguous 'cause.' Long-tail injuries produce progressive damage that takes place slowly over years or even decades." *State of Cal. v. Continental Ins. Co.*, 55 Cal. 4th 186, 195–96 (2012) ("*Continental I*").

outweigh those of the state where the insured risk is located and must be sufficiently compelling to trump the § 193 presumption." *Reichhold*, 243 Conn. at 781 (internal citation omitted).

Here, all parties agree that California law governs.[3] Even if there is no conflict, however, the Court must still apply Connecticut's choice of law rules to determine what law to apply to decide these motions. Under that framework, California law governs the court's contract interpretation analysis. *See New England Reinsurance Corp. v. Ferguson Enters., Inc.,* no. 12 CV 948, 2014 WL 1279263, at *3–4 (D. Conn. Apr. 8, 2014) (finding that California has the most significant relationship because "the insured risk is located in California where the products were sold and where the majority of the claims have been filed. The insured [] was a California corporation and its place of business was in California. The polices were purchased in California and almost all of the asbestos-related claims have been filed in California.").

Third, having decided that California law governs, it is appropriate to outline the applicable contract principles involved here under California law.

"The fundamental goal of contractual interpretation is to give effect to the mutual intent of the parties." Cal. Civ. Code § 1636. Intent is inferred from the written terms of the contract at the time the contract is formed. *Id.*; *Ameron Internat. Corp. v. Ins. Co. of State of Penn.*, 50 Cal. 4th 1370, 1378 (2010). "The 'clear and explicit' meaning of these provisions, interpreted in their ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage[,]' controls judicial interpretation.'" *E.M.M. I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004) (internal citations omitted).

"The whole of a contract is to be taken together, as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641.

---

[3] In each relevant section, the Court will note why California law applies.

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Palmer v. Truck Ins. Exchange*, 21 Cal. 4th 1109, 115 (1999) (quoting *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). "In general, interpretation of an insurance policy is a question of law. . . ." *Ameron Internat. Corp.*, 50 Cal. 4th at 1377.

"An insurance policy provision is ambiguous when it is susceptible to two or more reasonable constructions[.]" *Id.* at 1378. "The fact a term is not defined in the policies does not make it ambiguous." *Foster-Gardner, Inc. v. N'tl Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998). "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649; *see also Palmer*, 21 Cal. 4th at 1115 ("The court may 'invoke[] the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.'" (quoting *La Jolla Beach & Tennis Club, Inc. v. Industrial Indem. Co.*, 9 Cal. 4th 27, 37, 36 (1994)).

If ambiguity is present, however, "it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promise understood them at the time of formation." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807 (1990) (citations omitted). "The court will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985) (citing *Jarvis v. Aetna Cas. & Sur. Co.*, 633 P.2d 1359, 1363 (Alaska 1981) (applying California law)). "An ambiguous insurance provision is construed broadly in favor of the insured and in

16

order to protect a reasonable expectation of coverage." *Century Sur. Co. v. Cal-Regent Ins. Servs. Corp.*, 2015 WL 5167160, at *5 (S.D. Cal. Sept. 3, 2015) (citation omitted).

Having addressed these preliminary legal issues, the Court now applies these principles to resolve the outstanding motions: (1) by Century and Federal, as to whether they have a duty to defend First State or reimburse its costs; (2) by Fireman, as to whether it is required to provide coverage in the place of insolvent insurer Comstock Insurance Company or otherwise make an equitable contribution; and (3) by Central National, seeking clarity as to whether certain policy language means that the policy would be extended, but an additional aggregate limit would not be provided. The Court addresses each claim in turn.

### B.   Century/Federal—Duty to Defend and Duty to Reimburse Costs[4]

Before considering whether a duty to reimburse costs exists, the Court will consider whether this issue is ripe.

The Declaratory Judgment Act is limited by the other constraints of Article III jurisdiction: there must be a justiciable case or controversy. U.S. Const., Art. III § 2; *see also Dow Jones & Co. v. Harrods, Inc., Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ("As a threshold issue, DJA actions are justiciable only in cases in which an 'actual controversy' exists. The relevant inquiry for this prerequisite is coextensive with the analysis applicable to the 'case or controversy' standard embodied in Article III of the United States Constitution.").

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over

---

[4] California law applies as "the Federal and Century polices were issued to Familian at a California address to cover risks primarily located in California." Century/Fed. Mem. at 6. Applying California law is also consistent with the Court's previous Order, ECF No. 262.

administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Assoc. v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967)). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment is necessarily one of degree" and the courts have generally avoided drawing a bright line rule. *Md. Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The Second Circuit therefore requires that "[t]he standard for ripeness in a declaratory judgment action is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (*quoting Md. Casualty Co.*, 312 U.S. at 273). This Court then must ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*, 411 F.3d at 389.

This action is ripe. Contrary to Ferguson's argument, "[i]t has long been well-established . . . that a liability insurer may bring an action for a declaratory judgment against the parties in an underlying lawsuit involving its insured without waiting for the underlying action to proceed to judgment." *Empire Fire & Marine Ins. Co., v. Elrac, Inc.*, No. 04Civ.10315(GEL), 2006 WL 3734308, at *2 (S.D.N.Y. Dec. 18, 20016); *see also World Wrestling Entertainment, Inc. v. Ramos*, No. 3:10-cv-1399 (CFD), 2011 WL 3837088, at *3 (D. Con. Aug. 30, 2011) ("In general, federal courts have held that declaratory judgments are appropriate means to determine

indemnification obligations even before any underlying liability has been established. This question arises most frequently in cases regarding insurance coverage.").

A declaratory judgment in this case would help clarify the legal obligations of the insurers in the underlying asbestos lawsuits. *See Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) ("Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite 'future contingencies that will determine whether a controversy ever actually becomes real.'" (citation omitted)); *Allstate Ins. Co. v. Martinez*, No. 3:11-cv-574 (VLB), 2012 WL 1379666, at * 10 (D. Conn. Apr. 20, 2012) (declaratory judgment was appropriate even with a pending action in Connecticut state court because it would settle or clarify plaintiff-insurer's "obligation to defend or indemnify" thus providing the parties in the state action "'relief from uncertainty' during the pendency of the underlying" suit); *Kemper Independence Ins. Co. v. Tarzia*, 3:11-cv-00294 (JCH), 2011 WL 4345048, at *3 (D. Conn. Sept. 14, 2011) (holding that declaratory judgment surrounding plaintiff-insurers' "duty to indemnify the [defendants] for liability in the [underlying] suit would serve a useful purpose in clarifying its obligations"); *Empire Fire and Marine Ins. Co. v. Elrac, Inc.*, 2006 WL 3734308, at *3 (S.D.N.Y. Dec. 18, 2006) (declaratory judgment for the excess insurer was appropriate because "[g]iven the size of the claims in the underlying action, the prospect of [plaintiff-insurer] facing liability is real enough to make this an actual case or controversy").

Furthermore, determining the scope of the obligation here will not affect or implicate issues of *res judicata* within the underlying asbestos related suits currently being litigated, the issues of which presumably relate to whether a claim falls within a covered policy. This determination offers relief from uncertainty between Century and Federal, and First State and Ferguson. *See World Wrestling Entertainment, Inc.*, 2011 WL 3837088 at *3 (in an insurance

case, a declaratory judgment "serves a useful purpose in clarifying or settling the legal issues involved, because after the declaratory judgment, the insured knows out of whose pocket—his or his insurer's—any damages and costs of defense will be paid").

Accordingly, the controversy here is ripe for resolution.

Century and Federal argue that, applying California law, because "both the Federal and Century policies explicitly state each insurer has no obligation to assume charge of the defense, neither Federal nor Century has a duty to defend." Century/Fed. Mem. at 9. In their view, neither Century nor Federal's policies obligate them "to reimburse defense costs, unless it first consents to incurring those costs[,]" and courts across the country "have consistently held that this language requires the consent of the insurer, and that the insurer has no obligation to provide its consent." *Id.* Century and Federal argue that "they may elect to participate in the defense of the underlying claims at their option. If they choose to not participate, or do not first consent to incurring the costs, then they are not responsible for any such costs[.]" *Id.* at 12.

While First State concedes Century and Federal "have no duty to defend[,] . . . [and] if [they] choose not to participate in Familian's defense . . . then [they] have no obligation to reimburse defense costs[,]" it argues that "a declaration that [Century and Federal] have no duty to pay defense costs even if they choose to participate in the defense and exercise some control over it[,]" is relief that should not be granted. Opp'n to Century/Fed. at 1–2.

First State replies that both policies contain language "explicating limiting [] defense obligations." Opp'n to Century/Fed. at 2. Plaintiffs argue that, while there is no duty to participate or owe costs, if Century and Federal refuse to participate, they cannot "participate in Familian's defense even while declining to fund that defense." *Id.* at 3. Relatedly, First State interprets the policy language to mean that "the obligation to reimburse does not depend on

20

whether they participate in the defense, but solely on whether they consent to the incurring of costs." *Id.* In Plaintiffs' view, the text allows Century and Federal to "either . . . stand aside and cede all control of the defense to the insured and other insurers, or it can participate and consent to incurring costs." *Id.* at 4 (emphasis omitted).

Co-Defendant Ferguson argues that Century and Federal's motion is not yet ripe for adjudication. Ferguson Opp'n to Century/Fed. at 1. Ferguson contends that the policies to which Century and Federal refer "have not yet been triggered so Ferguson has neither requested [their] consent . . . to incur defense costs nor has it requested reimbursement of any defense costs." *Id.* at 2–3. In its view, "[t]he issues posed in the . . . motion . . . [are] entirely theoretical and presuppose[] the occurrence of unknown future events and policy triggers." *Id.* at 4.

Century and Federal reply that First State does not dispute "that Federal or Century has a duty to defend or to reimburse defense costs" and that "both Ferguson and First State have asserted claims against Federal and Century seeking declaratory relief regarding the duty to defend and to reimburse defense[] costs." Century/Fed. Reply at 1. Century and Federal argue "that for a declaratory judgment coverage action involving an excess policy to be ripe, it must be practically or reasonably likely the insured's potential liability will reach into the excess coverage[.]" *Id.* at 2 (quoting *Liberty Mut. Ins. Co. v. Lone Star Indus.*, 290 Conn. 767, 967 (2009)). In their view, the issues are justiciable. Lastly, Century and Federal do not object to First State's caveat: "that *if* Federal or Century chooses to participate in the defense of an underlying claim, *then* it should pay a share of the defense[']s costs." *Id.* at 3 (emphasis in the original).

The Court agrees, in part.

The relevant policy language[5] states:

> [Federal] shall not be called upon to assume charge of the investigation, settlement or defense of any claim made, or suits brought, or proceedings instituted against the insured, but shall have the right and be given the opportunity to be associated in the defense and trial of any such claims, suits or proceedings relative to any occurrence which, in the opinion of [Federal], may create liability on the part of [Federal] under the terms of this policy. . . . Court costs and interest, if incurred with the consent of [Federal], shall be borne by [Federal] and other interested parties in the proportion that each party's share of LOSS bears to the total amount of LOSS sustained by all interested parties.

Century/Fed. Ex. A—Policy, ECF No. 298-1 at 1 (Sept. 6, 2019).

### 1. Duty to Defend

The Court begins with the recognition that the policy expressly excludes a duty to defend. The plain meaning of this clause is to address one of the "two fundamental rules of insurance law: (1) [a] liability policy is presumed to include a defense duty unless the duty is excluded by clear and unambiguous language; and (2) a defense duty is presumed to be broader than the duty to indemnify." *Md. Casualty Co. v. Nationwide Ins. Co.*, 65 Cal. App. 4th 21, 30 (1998). The contract clearly and unambiguously states that "[Federal] shall not be called upon to assume charge of the investigation, settlement or defense of any claim made . . . ." Century/Fed. Ex. A at 1. There is no dispute that a duty to defend does not exist. *See* Opp'n to Century/Fed. at 3.

---

[5] The relevant indemnification policy language in the Century contract provides:

> [Century] shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve [Century], in which event the Insured and [Century] shall cooperate in all things in the defense or control of such claim, suit or proceeding, but no obligation shall be incurred on behalf of [Century] without its consent being first obtained, however in the event that the amount of the excess loss becomes certain . . . then, the Insured may pay the amount of excess loss . . . [and Century] will indemnify the Insured for such payment, or . . . pay such amount to the claimant on behalf of the Insured[.]

Century/Fed. Ex. B—Policy, ECF No. 298-2 at 2 (Sept. 6, 2019).

Accordingly, the Court finds that no duty to defend exists and turns to the question of reimbursement.

### 2.  Duty to Reimburse Costs

First State agrees that "Federal and Century . . . have no duty to participate in [the] defense, and that if they refuse to participate [in the] defense, then they owe no defense costs," Opp'n to Century/Fed. at 3, and Century and Federal do not object to the finding "that *if* Federal or Century chooses to participate in the defense of an underlying claim, *then* it should pay a share of the defense costs[,]" Century/Fed. Reply at 3 (emphasis in original).

Consistent with the parties' mutual understanding and agreement of the policy, the Court thus finds that Federal and Century do not have to participate in First State's defense and by refusing to participate neither Century or Federal owe any defense costs. If Federal or Century, however, choose to participate in the defense, both insurers will share in the defense costs.

Accordingly, Century and Federal's motion for summary judgment will be granted.

### C.  Fireman's Motion for Summary Judgment

#### 1.  "Drop Down"

Typically, "an excess policy would fill any gaps in coverage left open by the primary coverage in addition to increasing the total possible recovery by the insured." *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 812 (1982). Under horizontal exhaustion, "all primary insurance must be exhausted before an excess insurer must 'drop down' to defend an insured, particularly in cases of continuing loss . . . ." *N. Am. Capacity Ins. Co. v. Claremont Liability Ins. Co.*, 177 Cal. App. 4th 272, 293 (2009). "[T]o determine whether an excess insurer is obligated to bear the risk of an underlying insurer's insolvency[,]" courts look to the policy language found in the excess policy. *Wells Fargo Bank v. Cal. Ins. Guarantee Ass'n*, 38 Cal. App. 4th 936, 942 (1995); *see id.*

("We must ask whether the wording of the excess policy requires the excess insurer to provide the coverage that the underlying insurer would have assumed had it not become insolvent." (citation omitted)).

Fireman argues that, applying California law, Fireman's policy does not "drop down" in place of the second-tier insolvent policy. Fireman Mem. at 7–8.  In its view, the policy "is an excess policy that applies only after all the underlying insurance is properly exhausted by the payment of judgments or settlements[,]" *id.* at 8, and so, as a third layer excess policy, Fireman's policy "does not drop down and apply in place of the Comstock policy[,]" *id.* at 9. California law and courts in other jurisdictions, interpreting similar language, "have repeatedly found that [Fireman] is not obligated to drop down when an underlying insurer becomes insolvent." *Id.* at 11 (citations omitted).

Fireman further argues that, although a Liberalization Clause in Fireman's policy incorporates certain provisions by reference, Fireman's "policy language on the 'drop down' issue controls." *Id.* at 12. The First State Policy "applies only when the limits of liability of the underlying policies 'are exhausted solely as the result of Occurrences[,]" and requires the maintenance of underlying insurance 'except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of Occurrences" during the policy period. *Id.* at 12. (emphasis omitted). Finally, Fireman argues that courts have construed language present in First State's umbrella policy to state "that the umbrella insurer was not obligated to 'drop down' and pay amounts below the underlying limit when the underlying insurer became insolvent." *Id.* at 12–13 (citations).

Both Ferguson and First State oppose Fireman's motion for summary judgment. First State does not oppose Fireman's motion to the extent it seeks "a ruling regarding [Fireman's]

obligations to Ferguson to defend and indemnify Ferguson in the [u]nderlying [l]awsuit under its excess policy," however, First State opposes Fireman's motion to the extent it "seeks a broader ruling that First State is not entitled to seek equitable contribution from FFIC, now or in the future, because it fortuitously sits excess of an insolvent policy[.]" Opp'n to Fireman at 2.

First State first explains that, if Fireman's policy were to "drop down," Fireman "would begin providing coverage to Ferguson after only the Globe primary policy and the First State first-layer policy paid the full amount of their limits . . . as opposed to after those limits plus the limits of the now-insolvent Comstock policy were paid." *Id.* at 3. Whether Fireman "drops down" is an issue related to Fireman and Ferguson's contract. *Id.* But beyond that contract, First State may bring a claim for equitable contribution against Fireman and that claim "is not a contract action" and is not determined by "the terms of an insurance contract between an insurer and an insured . . . ." *Id.* at 4.

In its view, equity thus requires Fireman to contribute and "to insure the same risk as [Fireman] paid all of Ferguson's costs associated with the [u]nderlying [l]awsuits." *Id.* If Fireman's interpretation were adopted, neither Fireman nor any third layer policy holders would have to pay "because neither the Comstock layer nor the [Fireman] layer can horizontally exhaust." *Id.* at 5. First State then notes that one other court "concluded [] it would be unfair to allow an insurer that fortuitously issued a policy excess of an insolvent policy to avoid contributing along with the other paying insurers." *Id.* at 5.

Ferguson argues that Fireman's "interpretation of its policy language establishes the existence of a conflict between the policies regarding drop-down." Ferguson Opp'n to Fireman at 1. At a minimum, First State's policy creates an ambiguity "and the existence of an ambiguity requires [Fireman] to [] honor its contractual obligations . . . ." *Id.* Ferguson points to the

Liberalization Clause and interprets it as requiring First State's policy to control. *Id.* at 8 ("Per the Liberalization Clause, if a term or condition of the [Fireman] Policy deprives Ferguson of coverage and a term of condition of underlying insurance conflicts with that provision, the terms and conditions of the underlying insurance . . . controls.").

In its view, if the Fireman policy does not require "drop down," "the policies conflict in a manner that affects Ferguson's right to recover under the [Fireman] policy[,]" which means First State's policy controls and requires "drop down" because of Comstock's insolvency. *Id.* Ferguson also points to contract language[6] describing the limits of underlying insurance as evidence that the insurance "limits of the Comstock policy are not 'collectible by' Ferguson[,]" because Comstock is insolvent. *Id.* at 8–9. Ferguson refers to other clauses to support its argument. *Id.* at 10–12 (the "Limits of Liability" provisions "is intended to speak to what happens if the policy period of any underlying policy does not match with the policy period of the excess policy" and the "Maintenance Clause" "has no relevance to the underlying limits of liability or [Fireman's] duty to drop down). Ferguson contends that accepting Fireman's interpretation would create an ambiguity and thus the Court "should construe the [Fireman] Policy to protect the reasonable expectations of the insured and in favor of coverage." *Id.* at 12. It notes as support California precedent prevalent at the time of contract formation. *Id.* at 12–13.

Fireman replies to both First State and Ferguson. Fireman first notes that the "Liberalization Clause" expands coverage to ensure consistency with the underlying policy, but does not expand the limits of liability or require "drop down" from an excess insurer. Fireman

---

[6] Ferguson refers to First State Policy, Insuring Agreements § II.A, specifically that the underlying limit is "an amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule A of the underlying insurance, plus the applicable limits of any other underlying insurance collectible by the INSURED[.]" Ferguson Opp'n to Fireman at 3, 8.

Reply at 2–3. Thus, Fireman's "Liberalization Clause" "applies to the scope of coverage and operates to ensure that the [Fireman], Comstock, and First State policies cover the same risks." *Id.* at 5. Fireman policy provisions, however, control "drop down" and no party disputes that the Fireman policy "does not 'drop down' to replace underlying insolvent insurance." *Id.* at 5.

With respect to First State, Fireman argues "that equitable contribution claims apply only to insurers 'who share the same level of obligation on the same risk as to the same insured.'" *Id.* at 11 (emphasis and citation omitted). In its view, First State's argument lacks support and "is in direct contradiction to California law, which holds that such claims apply only to insurers who share the same level of obligation on the same risk." *Id.* at 11–12 (citation omitted). Under the terms of the Fireman policy, "once the covered costs and damages allocated to the 1982-1983 policy year are enough to exhaust the underlying insurance, including the underlying Comstock policy limit, then the [Fireman] Policy will apply and attach as if the Comstock policy were exhausted." *Id.* at 14.

With respect to Ferguson, Fireman argues that First State's policy "contemplates two types of 'underlying insurance'" and "that the scheduled underlying insurance, like the Comstock policy, does not have to be collectible." *Id.* at 6. Fireman disputes that the alleged "split" in authority that Ferguson relies on to create ambiguity does not actually exist and no actual ambiguity is present. *Id.* at 9–10.

The Court agrees.

The Court first considers the "drop down" issue and then will move to the equitable contribution issue. The excess policy provides:

> In the event of reduction or exhaustion of the applicable aggregate limit or limits of liability under said underlying policy or policies solely by reason of losses paid thereunder on account of occurrences

> during this policy period, this policy shall in the event of reduction,
> apply as excess of the reduced limit of liability thereunder . . . .

Fireman's Ex. A—Aff. Of Lawrence A. Levy (Fireman Excess Policy), ECF No. 306-1 at

FFIC000002 (Sept. 6, 2019) ("Fireman Excess Policy"). This language[7] is unambiguous and has

been interpreted by California courts to disallow drop down.

This language most closely parallels the provisions at issue in *Span*. *Span, Inc. v. Assoc.*

*Int'l Ins. Co.*, 227 Cal. App. 3d 463, 476 (1991) ("In the event of reduction or exhaustion of the

aggregate limits of liability applicable to the underlying . . . *by reason of losses paid thereunder*,

this policy shall, . . . (1) in the event of reduction pay the excess of the reduced underlying limit;

(B) in the event of exhaustion continue in force as underlying insurance." (alteration and

emphasis in the original)). The words, "by reason of losses thereunder," has routinely been found

"to preclude an obligation of the excess insurer to drop down upon the insolvency of the primary

insurer." *Wells Fargo Bank*, 38 Cal. App. 4th at 944–45 (quoting *Span, Inc.*, 227 Cal. App. 3d at

477–78) (collecting cases). This policy also adds the word "solely" "which strengthens

[Fireman's] position that its third level coverage does not 'drop down' to provide second level

---

[7] Ferguson refers to and relies on the Liberalization Clause in the Fireman umbrella policy to support its argument for drop down. Ferguson Opp'n to Fireman at 2–3. The Liberalization Clause provides:

> IT IS HEREBY AGREED THAT IN THE EVENT OF A CLAIM OR LOSS
> FOR WHICH INSURANCE IS PROVIDED BY POLICIES SHOWN IN THE
> SCHEDULE OF UNDERLYING INSURANCE, THE EXCESS OF WHICH
> WOULD BE INSURED HEREUNDER EXCEPT FOR TERMS AND
> CONDITIONS OF THIS POLICY WHICH ARE NOT CONSISTENT WITH
> THE UNDERLYING INSURANCE, THIS POLICY SHALL BE AMENDED
> TO FOLLOW THE TERMS AND CONDITIONS FO [sic] THE APPLICABLE
> UNDERLYING INSURANCE IN RESPECT TO SUCH CLAIM OR LOSS.

Fireman Excess Policy at FFIC000007. This clause "defines the scope of coverage" and plainly states that the excess policy covers the same risks as the underlying primary policy, even if not explicitly stated in the excess policy language. *Dexter Corp. v. N'tl Union Fire Ins. Co. of Pittsburg, Pa.*, 1997 WL 289677, at *4 (D. Conn. Mar. 12, 1997) (interpreting a similarly worded "Broad as Primary Endorsement" clause).

coverage upon [Comstock's] insolvency." *Id.* at 945. There is no ambiguity in the policy language that would require the Court to interpret the ambiguity against the insurer.

Accordingly, the Court finds that Fireman's policy does not "drop down."

### 2. Equitable Contribution

"Equitable contribution in the insurance context is a proper remedy when 'several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.'" *Lexington Ins. Co. v. Allianz Ins. Co.*, 177 F. App'x 572, 573 (9th Cir. 2006). It is the right to recover "not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution." *OneBeacon Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 175 Cal. App. 4th 183, 199 (2009) (emphasis in the original) (quoting *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 65 Cal. App. 4th 1279, 1293 (1998)). "The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Fireman's Fund*, 65 Cal. App. 4th at 1293 (citations omitted). "'Unlike subrogation, the right to equitable contribution exists *independently* of the rights of the insured' and does not arise out of contract." *Travelers Cas. & Surety Co. v. Am. Int'l Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005, 1026 (S.D. Cal. 2006) (quoting *Fireman's Fund*, 65 Cal. App. 4th at 1293–94).

Having considered whether Fireman will be required to "drop down," the Court now considers First State's equitable contribution claim. Notably, "there is generally no right to equitable contribution between a primary and an excess carrier, absent a specific agreement to the contrary." *Travelers Cas. & Sur. Co.*, 465 F. Supp. 2d at 1026; *see also Mitsui Sumitomo Ins. USA, Inc. v. Tokio Marine & Nichido Fire Ins.*, 659 F. App'x 918, 920 (9th Cir. 2016) (equitable

contribution claim failed because insurers shared different levels of risk—excess and primary); *Continental Casualty Co. v. Nationwide Mutual Ins. Co.*, 2014 WL 12607694, at *4 (C.D. Cal. Nov. 3, 2014) ("The cases indicate that a claim for equitable contribution may exist only between insurers who share common obligations, which is not the case with a primary and excess carrier. Put another way, if there exists no common obligation and no payment on the same risk, as is the case with excess and primary carriers, there exists no claim for equitable contribution."); *Am. Cas. Co. v. General Star Indem. Co.*, 125 Cal. App. 4th 1510, 1520–21 (2005) (because excess and primary insurers are not on the same level of liability, "there is no obligation of contribution between primary and excess insurers . . . absent specific agreement to the contrary"); *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 77 Cal. Rptr. 2d 296, 304 n.4 (Cal. App. 1998) (recognizing that equitable contribution claims apply to insurers "who share the *same* level of obligation on the *same* risk as to the *same* insured" (emphasis in original).

Accordingly, Fireman's motion for partial summary judgment will be granted in its entirety, including as to First State's claim of equitable contribution against it.[8]

### D.  Central National's Motion for Summary Judgment

#### 1.  Aggregate Limits

Central National's argument rests on the Court's previous Order setting aggregate limits for Swiss Re and American Home. Central Mem. Aggregate Limits at 1. Central National argues its umbrella policy and excess policy are subject to an aggregate limit for each annual period,

---

[8] To the extent First State argues, as it suggested at the motion hearing, that *Montrose Chemical Corp., v. Superior Court of Los Angeles County*, 9 Cal. 5th 215 (2020) ("*Montrose III*"), indicates a shift in law regarding equitable contribution, the Court disagrees. The California Supreme Court explicitly defined the issue under review as "whether vertical exhaustion is required when continuous injury occurs over the course of multiple policy periods for which an insured purchased multiple layers of excess insurance." *Id.* at 226. As a result, this Court will not apply *Montrose III* beyond that ruling's clear and specific holding. *See People v. Jennings*, 50 Cal. 4th 616, 684 (2010) ("It is axiomatic that cases are not authority for propositions not considered. The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning." (internal citations and quotation marks omitted)).

and each policy is "subject only to one $5 million aggregate limit each." *Id.* at 2–3. In its view, the relevant policies, facts and circumstances are "almost identical to the policy language in the American Home policy," meaning they are subject to an annual aggregate limit and "the extensions of the Central National policies cannot be viewed as creating two new aggregate limits in the amount of $5 million each." *Id.* at 7.

Both First State and Ferguson oppose this motion. First State "does not dispute Central National's description of the terms of its policies or the circumstances" of the policy extension, however, Plaintiff "does dispute that the Court's prior rulings support Central National's bid to limit its obligations to Familian." Opp'n to Central Aggregate Mot. at 1. But in its view, because Central National's policies define "annual period" as one year, and the policies are more than one year, two aggregate limits are appropriate. *Id.* In contrast to the Swiss Re and American Home policies, the Central National "policies [] define 'annual period' as 'each consecutive period of one year commencing from the effective date of this policy," meaning that "after one year from the effective date, the Central National policies provide an additional aggregate limit of liability." *Id.* at 2–3 (emphasis omitted). First State notes that the "annual period" in American Home was undefined. *Id.* at 3. Central National policies "are different than the policies the Court already ruled on, and by their plain terms Central National's policies provide that an aggregate limit of liability applies to a year of coverage." *Id.* at 4.

Ferguson makes a substantially similar argument. The Umbrella Policy establishes an "aggregate limit for 'each annual period' and a new annual period begins one year after the 'effective date.'" Ferguson Opp'n to Central Aggregate Mot. at 3. The excess policy establishes an aggregate limit "for each annual period during the currently [sic] of this policy," and while it "does not define 'each annual period[,]'" Ferguson argues that "this phrase cannot be interpreted

to mean anything other than the first annual period ending on March 5, 1980 and a second annual period then beginning." *Id.* at 3 (citations omitted).

The "stub period" payment "reflected only the reduced time that Central National was exposed to the loss during the second annual period. . . . [I]t does not reduce the available limits of liability." *Id.* at 11. "[T]he prorated premium paid for the sub period [then] entitles Ferguson to a full $5,000,000 in coverage for that period under each of the Policies, totaling an additional $10,000,00 in aggregate limits." *Id.* at 12. Ferguson asks that the Court deny Central National's motion, "declare that each of the Policies has an additional $5,000,000 in aggregate limits . . . [and] declare that Central National has an obligation to defend and indemnify Ferguson up to the $10,000,000 aggregate limit of each of the Policies." *Id.* at 13.

Central National replies that Ferguson and First State, "[h]aving failed to convince the Court to impose new aggregate limits for less than one year 'stub' periods in connection with the American Home and Swiss Re policies, . . . are now trying for a third bite of the very same apple based on the same case law and arguments" previously rejected, "this time with respect to Central National's policies." Central Aggregate Reply at 1–2. Central National again points to the Court's ruling that "the 10-day extension of the American Home policy did not result in a new $10 million aggregate limit because that was not the intent of the parties[.]" *Id.* at 4. In its view, the "Court should reach the same conclusion . . . and hold the 27-day extension of the Central National policies did not result in a new $5 million aggregate limit in each policy because that was not the intent of the parties[.]" *Id.*at 5.

Central National explains that, "at the time of the extensions, no monies had been paid under either Central National policy[,] [t]hus, the original aggregate limits remained available no matter the length of those policies." *Id.* at 5. Central National argues further that there is no

meaningful difference between its policies and those of American Home. *Id.* at 6. The definition of "annual period" "does not change that outcome" and "a brief extension of far less than 'one year' . . . plainly does not meet the definition of 'annual period' under the policy." *Id.* at 6.

The Court agrees.

With respect to the Swiss Re and the American Home policies, the Court was unwilling "to read into this policy two aggregate limits, based on a single, unexplained and undefined reference to the phrase 'policy year,'" Order at 18, or that an extension of days altered the understanding of annual period.

Here, the parties initially agreed to a policy term of March 5, 1979, to March 5, 1980, and then later agreed to modify that initial policy by the words, "Expiration – April 1, 1980." Ferguson Opp'n SMF to Central Aggregate ¶ 9. When the parties extended coverage, they intended to extend the policy period under the same terms and conditions of the previous policy. *See* Central National SMF Aggregate ¶ 11 (a letter from Familian to Central National reads: "Confirming our phone conversation of March 6, 1979, it was agreed that if we wish to extend the policy period to 4-1-80, you agreed to issue a premium bearing binder from 3-5-80 to 4-1-80 at the same term, conditions and premium base as the current policy").

In other words, Central National extended the same insurance coverage under the existing insurance policy for a few days, but did not offer more insurance coverage than provided under the existing insurance policy for these few days. This is the simplest and most straightforward way to interpret this insurance policy extension. If Ferguson and First State instead wanted the aggregate limit of insurance coverage not to be limited by the aggregate limits of an existing insurance policy, then Ferguson and First State could have sought an aggregate limit of insurance coverage not tied to the aggregate limit of an existing insurance policy. *See Certain*

*Underwriters*, 24 Cal. 4th at 968 ("[W]e do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose." (citation omitted)); *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985) ("The court will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." (citing *Jarvis*, 633 P.2d at 1363)).

The cases cited by First State and Ferguson to the contrary fail to yield the seemingly simple alternative result that they desire. For example, in one such case involving a cancellation, the Second Circuit did "not regard the District Court's assessment of the circumstances of the transaction between [the parties] and of the parties' intent to be erroneous." *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1217 (2d Cir. 1995). Likewise, in another case involving an interpretation of California law—one which again involved cancellation—the court's underlying conclusion on the aggregate limits issue rested on "the parties' expectations during the period the policy was in effect, prior to cancellation." *Flintkote Co. v. Am. Mut. Liab. Ins.*, No. 808-594, 1992 Cal. Super. LEXIS 2, at *98 (Oct. 14 1992). In short, the intentions of the parties and the circumstances surrounding each individual case governs the determination. *See Montrose III*, 9 Cal.5th at 230 ("Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions." (internal quotation marks and citations omitted)).

As a result, rather than construe an ambiguity in the policy language here, the Court finds that, consistent with the expectation of the parties to this specific transaction, a reasonable reading of this insurance policy means that the existing insurance policy would be extended, but an additional aggregate limit would not be provided.

Accordingly, Central National's motion for partial summary judgment on aggregate limits will be granted.

## 2. Prior Insurance and Non-Cumulation[9]

"California law favors stacking in continuous-injury cases." *Atain Specialty Ins. Co. v. Sierra Pacific Mgmt. Co.*, No. 2:14-CV-00609-TLN-DB, 2016 WL 6568678, at *3 (E.D. Cal. Nov. 3, 2016). "'Stacking' generally refers to the stacking of policy limits across multiple policy periods that were on a particular risk." *Continental I*, 55 Cal. 4th at 200; *see also St. Paul Fire and Marine Ins. Co.*, 2018 WL 897437 at *9 ("where an insurer has issued multiple policies over a time period in which a covered continuing injury has occurred, the policies 'stack,' that is, the insurer is liable up to the aggregate of the policy limits of each of the policies in effect during the continuing injury") .

It refers to "a claimant's repeated recovery for his injuries" or "a claimant's attempt to recover his claim from a second policy where recovery from a first policy is inadequate to compensate for his injuries." *Allstate Ins. Co. v. Mercury Ins. Co.*, 154 Cal. App. 4th 1253, 1259 (2007) (citations omitted). "Insurers may, however, integrate 'anti-stacking' provisions into their policies to limit policy coverage." *Ins. Co. of the State of Penn. v. Cty. of San Bernardino*, 2017 WL 2903259, at *2 (C.D. Cal. Mar. 7, 2017), *aff'd*, 776 F. App'x 400 (9th Cir. 2019). Anti-stacking provisions mean that if an "amount owed under an earlier policy equals the limits of a later policy that contains a non-cumulation provision, the later policy's limits are reduced to zero because of the provision." *Id.* at *5.

Central National moves for summary judgment "declaring that its 'Prior Insurance and Non-Cumulation Of Liability' provision reduces the aggregate limits of the later set of Central

---

[9] Central National argues that the relevant "policies were issued to Familian at a California address to cover risks primarily located in California." Central Mem. at 4 (citing Order at 15).

National policies." Central Mem. Liability at 1. It argues that this clause is a non-cumulation provision and, under the clause, "if a particular loss is covered under both the earlier Central National policies (1979-80) and the later Central National policies (1980-81) . . . then the aggregate limits of the later Central National policies (1980-81) are reduced by the amounts paid for that loss under the earlier Central National policies (1979-80)." *Id.* at 4.

In its view, the four Central National policies at issue "expressly prohibit the stacking of the aggregate limits[,]" meaning that "the non-cumulation provision applies in the context of a loss spanning multiple policies[.]" *Id.* at 6. Because the underlying claims against Familian "typically span multiple policies[,]" the aggregate limits of the second two policies should be reduced respectively. *Id.* at 6–7.

Ferguson responds that for the non-cumulation provision to apply, "the provision [must] be clear and unambiguous and [] a certain sequence of events that would trigger the provision [must] take[] place." Ferguson Reply to Central National Liability, ECF No. 329 (Oct. 18, 2019) ("Ferguson Reply to Central Liability"). In its view, none of the triggering events have occurred: (1) "neither Ferguson nor First State . . . have nor will they ask Central National to pay twice for any claim" and (2) "Central National [has not] identif[ied] a single expenditure that would be covered by this motion." *Id.* at 7. The anti-stacking or non-cumulation provision arguably "is designed to prevent double recovery on a single occurrence to the extent an insurer has already paid for the same occurrence under a prior policy issued by that same insurer"—such a claim, or a single occurrence, is not at issue here. *Id.* at 8–9 (citation omitted). Finally, Ferguson argues that Central National "must continue paying Ferguson's defense expenses under the Umbrella Policies." *Id.* at 13.

Int its reply, Central National cites to a previous interpretation by a court in this District,

which interpreted the same contractual language and found it contained an anti-stacking

provision. Central Reply Liability at 1–3.

The Court agrees with Central National.

The relevant policies contain similar language relating to non-cumulation. The umbrella

policies state:

> C. PRIOR EXCESS INSURANCE AND NON-CUMULATION
> OF LIABILITY
>
> It is agreed that if any loss covered [] is also covered in whole or in
> part under any other excess policy issued to the Insured prior to the
> inception date [] the limit of liability [] as stated in [the aggregate
> limits section] shall be reduced by any amounts due to the Insured
> on account of such loss under such prior excess insurance.
>
> [I]n the event that . . . an occurrence covered [] is continuing at the
> time of termination of this policy [Central National] will continue to
> protect the Insured for liability . . . without payment of additional
> premium.

Central Ex. A—Central National Liability Policy no. CNU 03-34-16, ECF No. 316 at

CEN000004–00005 (Sept. 6, 2019). The excess policies state:

> 1. PRIOR INSURANCE AND NON-CUMULATION OF
> LIABILITY
>
> It is  agreed that if any loss covered [] is also covered in whole or
> in part under any other excess Policy issued to the Insured prior to
> the inception date [] the limit of liability [] as stated in [the per
> occurrence and aggregate limits sections of the two policies] shall
> be reduced by any amounts due to the Insured on account of such
> loss under such prior insurance.
>
> Subject to the foregoing paragraph and to all the other terms and
> conditions of this Policy in the event that . . . an occurrence
> covered [] is continuing at the time of termination of this Policy[,

> Central National] will continue to protect the Insured for liability .
> . . without payment of additional premium.

Central Nat'l Ex. D, ECF No. 316–3 at CEN000042 (Sept. 6, 2019).

This language clearly and unambiguously limits the potential liability under both the umbrella or the excess policies and this "per-occurrence limit applies across policy periods." *Atain Specialty Ins. Co.*, 2016 WL 6568678 at *5; *see New England Reinsurance Corp. v. Ferguson*, 208 F. Supp. 3d 431, 437 (D. Conn. 2016) (holding that this policy language "provides for erosion of the limits of liability to the extent that 'any other excess policy' is construed to include only other prior excess policies issued by [Central National]"); *see also Ins. Co. of the State of Penn.*, 2017 WL 2903259, at *15 (recognizing that "if the amount owed under an earlier policy equals the limits of a later policy that contains a non-cumulation provision, the later policy's limits are reduced to zero because of the provision"). Any potential reduction thus depends on the limits reached in previous policies.

Accordingly, the Court will grant Central National's motion for summary judgment on the prior insurance and non-cumulation of liability provisions.

## IV.   CONCLUSION

For the foregoing reasons, the motions for summary judgment are **GRANTED**.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of May, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE